IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


COHRS V. BRUNS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


DAN COHRS, APPELLEE,

V.

LANA SUE BRUNS, APPELLANT.


Filed December 8, 2015.    No. A-14-740.


Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed in part, and in part reversed and remanded with directions.

Stephanie Weber Milone for appellant.

Jon J. Puk, of Woodke & Gibbons, P.C., L.L.O., for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Lana Sue Bruns (Lana) appeals and Dan Cohrs (Dan) cross appeals from a modification order by the district court for Douglas County which, among other things, modified the custody and parenting time of Lana and Dan's minor child, increased the amount of Dan's monthly child support obligation, and denied Lana's request to remove the child from Nebraska to Colorado. Because we find that the district court erred in the determination of Dan's income, the calculation of modified child support, and the date of retroactivity of the child support modification, we reverse those portions of the order and remand with directions to the trial court. Finding no abuse of discretion by the court in the remaining modification order, we affirm in all other respects.

- 1 -

## II. BACKGROUND

Dan and Lana are the parents of a daughter Karsten born in June 2003. Dan and Lana were never married; in fact, Karsten was born to Lana during Dan's marriage to his wife Chris. Dan and Chris remain married and are the parents of a son Drake born in October 1996. Dan and Chris live in Logan, Iowa. Lana lives in Omaha, Nebraska with Karsten. Karsten attends a private parochial school in Council Bluffs, Iowa. Lana and Dan both work for United Airlines at Eppley Airfield in Omaha. Lana is single but is in a relationship with a man living in the Denver, Colorado metro area.

On March 10, 2005, the district court for Douglas County entered a paternity decree, awarding joint legal custody of Karsten to Dan and Lana, with Lana being awarded primary physical care of Karsten subject to Dan's visitation rights as specified in the Parenting Plan agreed to by the parties and incorporated into the original decree. The Parenting Plan specifically provided that Dan would have parenting time with Karsten every other weekend, starting at 2:00 p.m. on Friday and continuing until 8:00 p.m. on Sunday. The plan also provided that once Karsten reached school age, Dan will be allowed on certain weekdays to pick up Karsten from school at 3:30 p.m. and return her to Lana at 8:00 p.m. the same day. Additionally, the plan established visitation schedules for certain holidays, birthdays, and summer break. The plan, as later clarified, provided that Dan and Lana shall have joint decision-making power concerning Karsten's education, religion, medical, and other major decisions. The court also ordered Dan to pay child support of $400 per month and determined that Lana could claim the tax exemption for Karsten.

On October 25, 2010, Lana filed a complaint to modify the decree. First, Lana sought several modifications of the original decree with regard to the visitation arrangement. Lana requested that an order be entered prohibiting Karsten from sharing a bedroom with Drake during her visits with Dan, prohibiting Chris from being present during visitation, and restraining Dan and Chris from making any derogatory remarks to Karsten or in the presence of Karsten regarding Lana. To support these requests, Lana alleged that Karsten was being exposed to a very negative and hostile environment at Dan's home during weekend visits, that Chris has made harmful derogatory remarks about Lana in the presence of Karsten (many of which were allegedly made directly to Karsten), and that Chris has restricted contact between Karsten and Lana during weekend visitation by taking away the cell phone Lana has provided to Karsten and refusing to return the phone until visitation is over. Lana sought a "right of first refusal" to prevent Karsten from being left with Chris during Dan's weekend visits. Lana also requested that the return time for Karsten on Sundays be modified to 5:00 p.m. rather than 8:00 p.m. because 8:00 p.m. is too late for Lana to help Karsten with homework and to prepare her for the school week.

Next, Lana requested that Dan's child support obligation be increased based on the current income of the parties, alleging that Dan's income has increased since the original order, and that such modification be effective on the date of the filing of the complaint to modify. Lana also requested that Dan be required to pay for his portion of Karsten's school tuition and for Lana's attorney fees.

Dan answered and filed a counterclaim, seeking modifications in custody and visitation. First, Dan argued that it would be in the best interests of Karsten to be placed in the joint legal

custody of the parties (as was the case in the original decree) but that primary physical custody be transferred to Dan. In the alternative, Dan requested that the Parenting Plan be modified to allow for expanded visitation by Dan, including an award of joint physical custody. To support his counterclaim for change in custody, or expanded visitation in the alternative, Dan alleged a material and substantial change in circumstances based on Karsten expressing a desire to live and spend more time with Dan at his residence; that Dan has, at the request of Lana, taken Karsten on numerous occasions and exercised substantially more parenting time than established in the Parenting Plan; that Karsten attends school in Iowa where Dan lives; that both Dan and Lana share an employer and have the same work shift which allows for both parents to provide for Karsten's needs and education; that Lana has made substantial derogatory, false, and malicious statements to Karsten and manipulates Karsten resulting in damage to her relationship with Dan and Chris; and that Lana otherwise acts in such a way that is not in the best interests of Karsten.

Beyond his requested change in custody and visitation, Dan also asked that the court award him the child dependency tax exemption for Karsten, along with an award of attorney fees for having to defend Lana's complaint to modify.

On March 23, 2011, Lana filed an amended complaint for modification in which she also requested that she be granted permission to remove Karsten from Nebraska to Colorado. Lana alleged that she has applied for a transfer to Denver, Colorado with her employer, and that Lana and her significant other, who resides in Denver, intend to get married. Lana alleged that such removal and continued custody with Lana would be in Karsten's best interests. Dan filed an answer to the amended complaint for modification, denying Lana's request for removal and otherwise renewing his prayer for relief contained in his original answer and counterclaim.

A temporary order was entered by the court on October 31, 2011. The order provided that Dan must be present with Karsten during all visits, that Karsten not be left alone with Chris or Drake for longer than one hour, that Dan and Lana both receive a "right of first refusal" if the other is going to be unable to personally care for Karsten for a period of 3 hours or more, that Karsten may not sleep in the same room as Drake, that Dan and Lana agree not to discuss differences in the presence of Karsten, that Karsten have access to a cell phone during visits with Dan, and that the parties and Karsten shall attend family counseling with Dr. Tom Haley (Haley).

Between Lana's original complaint to modify and the court's final modification of the decree (a span of approximately 3 years and 9 months), numerous motions were filed by the parties. These included motions by Lana to compel discovery, to amend the scheduling order, to discontinue the court-ordered therapy sessions with Haley, to recuse the original trial judge, for contempt (7 motions), to allow Karsten to testify as a child witness (which Dan resisted), and to alter or amend judgment. Dan filed motions seeking to enforce visitation, to amend the temporary order, for removal of the child to Iowa, to enforce and re-initiate counseling, for contempt, and for new trial. The original trial judge was recused during the pendency of the action and the new trial judge acknowledged that the delay between the first and last days of trial was a result of the court's busy calendar.

The trial was held before the district court for Douglas County on several days beginning in October 2012, and continuing in January, April, and May 2013. The court heard testimony from

the parties, Karsten, Haley, Chris, various other members of Dan's family, a co-worker of Dan and Lana, and a close friend of Dan and the Cohrs family. Numerous exhibits were also received.

The parties presented conflicting testimony throughout the trial regarding their relationship and their respective overall ability to care for Karsten. Lana accuses Dan of various acts of harassment and domestic abuse towards her, as well as alleged mistreatment of Karsten by Dan and Chris. Dan strongly denied these allegations and presented evidence regarding his close relationship with Karsten and of Lana's harassment and erratic behavior, which Dan maintains causes harm to Karsten.

This record on appeal contains over 1,200 pages of testimony and 155 exhibits. We have thoroughly reviewed the complete record. However, it would serve no purpose to detail the contentious testimony of the parties as it relates to the care and custody of Karsten, particularly since the award of sole legal and physical custody of Karsten to Lana is not being challenged on appeal.

As provided for under the temporary order, Haley began counseling Karsten in 2011. Again, we need not detail all of his testimony as may be pertinent to the determination of custody. Of importance to the issues on appeal, however, is Haley's testimony about the emotional and behavioral effect upon Karsten of the contentiousness between her parents, the difficulty Karsten was having with the transition between her parents' homes, and Haley's recommendation that Karsten would benefit from continued counseling.

With regard to the issue of parenting time, Lana presented evidence to support her request that certain limitations be placed on Dan's visitation (consistent with the limitations set forth in the temporary order), and in opposition to Dan's request for additional parenting time. Lana testified to alleged inappropriate statements and actions of Dan and his family during Karsten's time in his home. Lana also testified that Dan has violated the visitation schedule and related provisions under the original parenting plan. Dan, on the other hand, testified that Lana would regularly deny visitation to him and block his ability to communicate with Karsten while she was in the care of Lana.

Complicating matters in the division of parenting time were the work schedules of Lana and Dan and the transportation logistics between visitations and Karsten's school and activities schedule. Dan's home in Logan, Iowa is approximately a 45-minute drive each way from Omaha. Dan and Lana's employment with United Airlines involves changing work shifts and unusual hours. At the conclusion of trial, Dan was working a 12:45 p.m. to 9:00 p.m. shift but anticipated returning to a 9:00 p.m. to 5:30 a.m. shift. Lana's shift would typically begin at 4:00 a.m. and last until 12:30 p.m.

Beyond the difficulties in facilitating visitation created by work and school schedules, the events surrounding the transition of Karsten between the parties were a major concern. According to both Dan and Lana, these transition points would lead to confrontations. Dan testified that while he used to pick up Karsten from a babysitter or at school, since around 2010 Lana has demanded that Dan pick up Karsten at her home. Each party testified to misdeeds and inappropriate comments made by the other during these transitions. Haley testified that using neutral pickup and drop off sites may be a good method to avoid such transitional conflict, such as by picking up and dropping off Karsten at school during the school year.

Lana presented evidence about her desire to remove Karsten to Colorado. Lana testified that she is pursuing a relationship with a man living in the Denver metro area, and that they intend to get married. Lana stated that if the court grants her request to remove Karsten, she would be able to accept a lateral transfer with United Airlines in Denver. She received a transfer offer on February 2, 2012, but was only given two business days to make a decision, so she had to decline due to the trial. If granted permission to remove Karsten, Lana claims that she still could receive a job transfer if she renews her transfer request. The position in Colorado would amount to a lateral transfer because it would not entail an increase in income or a promotion and the benefits provided would remain the same. In fact, Lana testified that she may choose to work part-time in the transfer position, leading to a decrease in earnings. Lana thought that the transfer position may come with more job security.

Further evidence was adduced regarding the issues of child support, payment for Karsten's private school tuition, and the income tax dependency exemption for Karsten. We will detail this evidence in the pertinent sections of the analysis below.

On July 24, 2014, the district court entered a final Amended and Supplemental Order of Modification of Decree. First, the court noted that while the truth of the various accusations made by the parties was often not clear, the record makes it abundantly clear that the relationship between the parties became continuously more hostile. The court found that this deterioration in the relationship between the parties amounted to an unanticipated substantial change in circumstances following the original decree, forming the primary justification for the court's decision to modify the decree and parenting plan.

The court concluded that joint legal and physical custody with primary possession with Lana was no longer in the best interests of Karsten. Rather, the court found that the best interests of Karsten would be better served by granting Lana both legal and physical sole custody of Karsten while granting Dan expanded, significant parenting time. The court denied Lana's request to remove Karsten to Colorado. The court found that Lana failed to establish a legitimate reason for the removal.

The court increased Dan's child support payments to $812 per month commencing on March 1, 2014 and increasing further to $952 per month once Drake reaches the age of 18 (the age of majority in Iowa). The court determined that Dan's child support should be applied retroactively from November 1, 2012, to the end of February 2014 for a total amount to be paid of $6,592, and the court entered a judgment against Dan in this amount. The court determined that Dan's child support obligation would abate by 80 percent for his entire June child support payment and 80 percent for half of his July child support payment. The court modified the previous decree to allow each party to alternate on an annual basis the tax dependency exemption claim for the minor child.

The court rejected Lana's assertion that Dan committed fraud in withholding information regarding his farming income when the original decree was established in 2005 and her request that additional child support be applied retroactively to the date of the original decree. The court also denied Lana's request that the court order Dan to pay for one-half of Karsten's private school tuition.

The court expressly terminated all prior temporary orders. Specifically, the court stated that "any provisions pertaining to the limitations on (Dan's) exercise of his parenting time including,

but not limited to, the involvement of his family during that parenting time and/or assisting in transportation are no longer enforceable." Thus, the court denied Lana's requests that Chris be prohibited from being present during Dan's parenting time, that Karsten not sleep in the same room as Drake, and that Dan and Chris be prohibited from making derogatory comments to or in the presence of Karsten. The district court also determined that neither party will receive a "right of first refusal" with regard to Karsten.

With regard to counseling, the district court determined that it would be in the best interests of Karsten to continue counseling with Haley. The court ordered both parties to facilitate the beginning of the counseling process and to continue counseling at a pace recommended by Haley, but for a period not to last more than 1 year from the date of the final amended order.

Lastly, the court ordered that each party pay their own attorney fees. Lana subsequently perfected her appeal to this court and Dan his cross-appeal.

### III. ASSIGNMENTS OF ERROR

Lana asserts that the district court erred in (1) increasing and modifying Dan's parenting time and denying Lana's requests to change the transition time, (2) denying Lana's requests that Dan be prohibited from allowing Karsten and Drake to share a bedroom, that Dan's wife be prohibited from being present during Karsten's visits, that a restraining order be entered to prohibit derogatory comments in Karsten's presence, and that Lana be given a "right of first refusal" to care for Karsten, (3) calculating the modified child support obligation, (4) allowing 80 percent abatement of Dan's child support obligation during his summer parenting time, (5) not making Dan's increased child support obligation retroactive to the date Lana filed her modification complaint, (6) not ordering Dan to pay for Karsten's private school expenses, (7) alternating the child dependent tax exemption for Karsten between Lana and Dan, (8) ordering Karsten to continue counseling, (9) sustaining Dan's objection to admission of Lana's cell phone conversation recordings, (10) not awarding attorney fees to Lana, (11) not holding that Dan committed fraud and not modifying his child support obligation to the date of the original March 14, 2005 paternity decree, and (12) denying Lana's request to remove Karsten to Colorado.

Dan on cross-appeal asserts that the district court erred in failing to grant his request that his Wednesday parenting time be extended to include until Thursday morning.

### IV. STANDARDS OF REVIEW

Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). See, also, *Latham v. Schwerdtfeger*, 282 Neb. 121, 802 N.W.2d 66 (2011); *Farnsworth v. Farnsworth*, 276 Neb. 653, 756 N.W.2d 522 (2008). In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Cesar C. v. Alicia L.*, 281 Neb. 979, 800 N.W.2d 249 (2011). See, also, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004).

An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015).

In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015). See, also, *Simon v. Drake*, 285 Neb. 784, 829 N.W.2d 686 (2013); *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012).

An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Absent such an abuse, the award will be affirmed. *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

## V. ANALYSIS

### 1. PARENTING TIME

The district court amended Dan's parenting time as follows. Dan was granted additional visitation every Wednesday after school, or 3:30 p.m. if no school, and continuing until 8:30 p.m. the same evening. His weekend visitation during the school year was expanded from the original parenting plan (which allowed visitation every other weekend from Friday at 2:00 p.m. until Sunday at 8:00 p.m.) to every other weekend from Friday after school at 3:30 p.m. until returning Karsten to school Monday morning at 7:30 a.m. Dan's summer parenting time was expanded to one-half of the summer vacation school break, alternating the first and second half in even and odd years. The holiday visitation was further revised and specified. Additionally, the parties were ordered to alternate Karsten's birthday on an annual basis. With regard to limitations on Dan's visitation, the right of first refusal contained in the temporary order was eliminated by the district court in its final order. Similarly, the other restrictive provisions from the temporary order affecting Dan and his family during visitation were terminated.

Lana asserts that the district court erred in increasing Dan's parenting time. Additionally, Lana claims that the court erred in denying Lana's requests to change the transition time on Dan's alternating Sundays from 8:00 p.m. to 5:00 p.m., that Dan be prohibited from allowing Karsten and Drake to share a bedroom, that Dan's wife be prohibited from being present during Karsten's visits, that a restraining order be entered to prohibit derogatory comments in Karsten's presence, and that Lana be given a "right of first refusal" to care for Karsten.

### (a) Modification of Visitation Rights

The party seeking modification of a child custody matter such as visitation bears the burden of showing a material change in circumstances subsequent to the original decree. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Before visitation may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child.

*Id.* The best interests of the child is the primary and paramount consideration in determining and modifying visitation rights. *In re Estate of Jeffrey B.*, 268 Neb. 761, 688 N.W.2d 135 (2004).

Neb. Rev. Stat. § 43-2923 of the Nebraska Parenting Act sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regards to visitation rights. Such factors include the relationship of the minor child with each parent, the desires of the minor child, the general health and wellbeing of the minor child, and credible evidence of abuse inflicted on the child by any family or household member. In addition to considering these statutory factors, the Nebraska Supreme Court has held that courts should determine "the nature and extent of visitation rights on a case-by-case basis" and may consider many factors and circumstances in each individual case, such as:

the age and health of the child; the character of the noncustodial parent; the place where visitation rights will be exercised; the frequency and duration of visits; the emotional relationship between the visiting parent and the child; the likely effect of visitation on the child; the availability of the child for visitation; the likelihood of disrupting an established lifestyle otherwise beneficial to the child; and, when appropriate, the wishes of the child.

*Fine v. Fine*, 261 Neb. 836, 843, 626 N.W.2d 526, 532 (2001).

A visitation schedule is generally considered reasonable if it is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). There is not a certain mathematical amount of visitation that is considered reasonable; the determination of reasonableness is to be made on a case-by-case basis. *Id*.

The district court found that an unanticipated material change in circumstances had occurred subsequent to the original decree of paternity (deterioration of the relationship and communication between the parties), which justified modification of Dan's parenting time and it further concluded that expansion of Dan's visitation is in the best interests of Karsten.

Based upon our de novo review, we find no abuse of discretion in the district court's finding of a material change in circumstances that justified modification of Dan's parenting time and that such modification was in Karsten's best interests. In reaching this conclusion, we are mindful that the district court also eliminated Dan's prior joint legal custody and denied his request for physical custody. The record is replete with evidence of a deterioration in Lana and Dan's relationship, their increasing inability to communicate and coordinate regarding matters affecting Karsten, and of the difficulty in transitioning between the parties' respective homes. These difficulties have in turn had a negative impact on Karsten. The district court's order attempts to minimize these conflict points. The district court also determined that the best interests of Karsten included having significant parenting time with Dan. We agree.

Given our review of the record, we find no abuse of discretion in the district court's modification of Dan's visitation schedule. Considering the various factors, circumstances, and dynamics between the parties existing in this case, the district court reached a reasonable result in its modification of Dan's parenting time.

We briefly address Lana's assertion that Dan failed to allege a request for expanded visitation in his answer to her amended complaint for modification, or that he was limited in his

request to modify visitation based on their history of visitation. Contrary to Lana's assertion, Dan did preserve his request for expanded visitation by renewing his prayer for relief in his previous answer and counterclaim, wherein he alleged a material change in circumstances warranting expanded visitation and a review of the parenting plan. And, the parties clearly litigated Dan's request for expanded parenting time. Therefore, Lana's argument is without merit.

Lana also argues the parties should be bound by the stipulations made in the original paternity decree and that no "exceptional circumstances" have accrued that would allow for a deviation from such a settlement agreement. Constraining the visitation modification analysis to the limitations imposed by prior stipulations is a misapplication of the law. As previously established, the relevant inquiry is whether or not a material change in circumstances has occurred justifying a modification in visitation from a prior agreement which would serve the best interests of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The district court did not abuse its discretion in modifying the original paternity decree based on the material change in circumstances impacting Karsten's best interests.

Lastly, with regard to Lana's additional assignments of error pertaining to the visitation modification, we conclude that the district court did not abuse its discretion in denying Lana's requests to change the transition time on Dan's alternating Sundays from 8:00 p.m. to 5:00 p.m., to continue the restrictions to Dan's visitation contained in the temporary order, and to give Lana a "right of first refusal" to care for Karsten.

### (b) Dan's Cross-Appeal regarding Wednesday Visitation

Under the same analytical standards, the district court also did not abuse its discretion in denying Dan's request that his visitation on Wednesdays should be expanded to overnight. Dan argues that such an overnight arrangement, with Dan picking up Karsten after school on Wednesday and returning her to school Thursday morning, would avoid a confrontation with Lana and would be consistent with the court's expansion of his alternating weekend visitation to include overnights on Sunday.

While the district court did not directly address Dan's request for Wednesday overnight visitation, we cannot say that the court abused its discretion in setting the Wednesday visitations from 3:30 p.m. until 8:30 p.m. during the school year. Presumably, the district court was balancing the need to allow regular parenting time with Dan and Karsten's need for stability during the school year. Dan's cross-appeal is without merit.

### 2. CALCULATION OF CHILD SUPPORT

Lana makes numerous arguments in support of her claim that the district court erroneously calculated Dan's modified child support obligation.

The paramount concern in child support cases, whether in the original proceeding or subsequent modification, is the best interests of the child. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines adopted by the Nebraska Supreme Court, which are presumed to be in the best interests of the child. *Id*. See, also, Neb. Rev. Stat. § 42-364.16; *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In determining the amount of a child support award, a trial

court must consider the status, character, and situation of the parties and attendant circumstances, including the financial condition of the parties and the estimated cost of support of the children. *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999). See, also, *Anderson v. Anderson, supra*.

(a) Determination of Dan's income

Dan receives income through his employment with United Airlines and as a partner in Cohrs Farms LLC, which is a farming operation with Dan's brother. Dan also farms individually. In addition, Dan and Chris receive some rental income from Iowa farm ground owned by Chris which Dan and his brother farm. This farming rental income is reflected on Dan and Chris' 2011 and 2012 joint tax returns under Schedule E, Part I, column B. The source of this farming rental income was incorrectly labeled as "single family residence" instead of "land" on the Schedule E's. However, the source of this rental income was correctly labeled as "farmland" in the supplemental documents contained in these joint tax returns. It appears that there was no such farming rental income in 2010. There was also rental income from real estate in Okoboji, Iowa owned by Chris included in the joint tax returns.

In the decree, the district court determined the incomes of Chris, Lana, and Dan. The court computed Chris' income by using her employment wages on the 2012 joint tax return, finding her monthly income to be $2,575. The court determined Lana's gross monthly income from her 2012 tax return, finding it to be $5,439. For Dan, the court averaged the last three years of his income (2010-2012) and computed each year as follows:

| 2010 | |
|---|---|
| Wages | $ 40,706 |
| Dividends | 544 |
| Interest | 25 |
| Capital gains | 166 |
| Foreign fees | 474 |
| Schedule E - farm partner income | 26,395 |
| (adding back in depreciation) | |
| Total annual income 2010 | $ 68,310 |

| 2011 | |
|---|---|
| Wages | $ 46,610 |
| Dividends | 600 |
| Interest | 32 |
| Capital gains | 3,012 |
| Foreign fees | 493 |
| Schedule E - farm partner income | 55,809 |
| (adding back in depreciation) | |
| Total annual income 2011 | $106,556 |

<u>2012</u>

| | |
|---|---:|
| Wages | $ 52,608 |
| Dividends | 1,027 |
| Interest | 79 |
| Capital gains | 1,031 |
| Foreign fees | 541 |
| Schedule E - farm partner income | 70,241 |
| (adding back in depreciation) | |
| Total annual income 2012 | $125,527 |

The district court averaged the three years and determined Dan's gross monthly income to be $8,344.

### (b) Child Support Worksheets

The district court prepared several different child support calculations. First, the court computed the child support that Dan would owe for Drake using Chris' monthly gross income of $2,666 (this figure is accurate based upon the tax return although it differs slightly from the $2,575 noted in the body of the decree) and Dan's average monthly gross income of $8,344. The court calculated Dan's obligation for Drake to be $874 per month, which figure the court then used as a deduction in the calculations of Dan's support for Karsten. Next, the court prepared two alternate worksheets with Lana and Dan's incomes; one categorizing Lana as head of household with two exemptions; and Dan as single, with one exemption, and self-employed. The second worksheet categorized Lana as single with one exemption; and Dan as head of household, with two exemptions, and self-employed. Although the court did not discuss why it prepared the two worksheets in this manner, presumably it was in part to take into account the court's decision to alternate the income tax dependency exemption for Karsten. Under the first worksheet, Dan's child support obligation for Karsten was $780, and under the second worksheet Dan's child support obligation was $845. The court then averaged these figures and set Dan's child support obligation at $812. The court utilized the same method (with two alternative worksheets) in determining support for Karsten once Drake reached the age of majority and Dan no longer received a deduction for support for Drake.

### (c) Farm depreciation

Lana asserts that the district court erred in its determination of Dan's farm income. Lana focuses primarily on how farming-based depreciation was treated for purposes of the calculation. Lana argues that Dan failed to satisfy his burden to show entitlement to an allowance for claimed depreciation on his income tax return for child support purposes.

The Nebraska Child Support Guidelines provide that in calculating child support, a court must consider a party's total monthly income derived from all sources. Neb. Ct. R. § 4-204. See, also, *State on Behalf of A.E. v. Buckhalter*, 273 Neb. 443, 730 N.W.2d 340 (2007). The Guidelines also explain how depreciation should be treated for purposes of determining total monthly income for child support purposes. Neb. Ct. R. § 4-204 provides the following:

Depreciation calculated on the cost of ordinary and necessary assets may be allowed as a deduction from income of the business or farm to arrive at an annualized total monthly income. After an asset is shown to be ordinary and necessary, depreciation, if allowed by the trial court, shall be calculated by using the "straight-line" method, which allocates cost of an asset equally over its useful duration or life. An asset's life should be determined with reference to the Class-lives and Recovery Periods Table created pursuant to 26 CFR § 1.167(a)-11. A party claiming depreciation shall have the burden of establishing entitlement to its allowance as a deduction.

Neb. Ct. R. § 4-204 requires that a party claiming an allowance of depreciation as a deduction from income furnish to the court copies of a minimum of 5 years' tax returns. We note that Dan offered tax returns for the years 2008 through 2012, although the court only used the last three years in determining Dan's income. Lana does not take issue with the 3-year income averaging by the district court. See *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007) (no abuse of discretion in using 3-year average in dealing with farm income).

Dan and Chris' joint tax returns contain a Schedule E (Supplemental Income and Loss), which includes the rental income described above, and partnership income received by Dan from Cohrs Farms LLC. The pertinent information on Schedule E from the tax returns is as follows:

2010
*Part I* (Income or Loss from Rental Real Estate)

| | |
|---|---:|
| Rents received | $ 7,300 |
| Total expenses (including $1,659 depreciation) | 8,736 |
| Total rental real estate loss | (1,436) |

*Part II* (Income or Loss from Partnership) (Cohrs Farms LLC)

| | |
|---|---:|
| Nonpassive income from Schedule K-1 | $149,541 |
| Section 179 expense deduction | 123,369 |
| Total partnership income | 26,172 |
| Total Schedule E income | $ 24,736 |

2011
*Part I* (Income or Loss from Rental Real Estate)

| | |
|---|---:|
| Rents received | $ 60,950 |
| Total expenses (including $1,659 depreciation) | 8,313 |
| Total rental real estate income | 52,637 |

*Part II* (Income or Loss from Partnership) (Cohrs Farms LLC)

| | |
|---|---:|
| Nonpassive income from Schedule K-1 | $ 15,594 |
| Section 179 expense deduction | 2,756 |
| Total partnership income | 12,838 |
| Total Schedule E income | $ 65,475 |

2012

Part I (Income or Loss from Rental Real Estate)

| | |
|---|---|
| Rents received | $ 75,316 |
| Total expenses (including $1,659 depreciation) | 7,958 |
| Total rental real estate income | 67,358 |

Part II (Income or Loss from Partnership) (Cohrs Farms LLC)

| | |
|---|---|
| Nonpassive income from Schedule K-1 $ | 2,674 |
| Section 179 expense deduction | 1,450 |
| Total partnership income | 1,224 |
| Total Schedule E income | $ 68,582 |

In our review, we find that the district court failed to include the Schedule E Part II partnership income of $12,838 for 2011 in its calculation. The total Schedule E income for 2011 as noted above was $65,475 (and $67,134 if the depreciation of $1,659 is added) as opposed to the $55,809 determined by the court.

With regard to depreciation, the district court added back in the $1,659 depreciation expense claimed on Part I of the Schedule E from each year's rental income in performing its calculation of Dan's income. We note that this depreciation amount appears to reflect an equal, straight-line deduction each year and may have been an appropriate deduction under the Guidelines, however, as we discuss further below, there was no evidence adduced regarding any of the depreciation expenses as to whether they were calculated on the cost of ordinary and necessary assets or the method of calculation used. More importantly, the district court did not address the Section 179 depreciation expense deductions contained on Part II of Schedule E, which deductions totaled $127,575 over the 3-year period. As set forth above, the Guidelines require that an asset be shown to be ordinary and necessary, and depreciation is then to be calculated by using the "straight-line" method, which allocates the cost of an asset equally over its useful duration or life.

This court has previously discussed the application of Neb. Ct. R. § 4-204 in a situation where a party had used the "fast write off" method under I.R.C. § 179 for depreciation deduction elections rather than the straight-line method required by § 4-204. See *Bussell v. Bussell*, 21 Neb. App. 280, 297-298, 837 N.W. 2d 840, 854-855 (2013). In that case, the father had deducted depreciation on farm and business equipment using the "fast write off" method for Section 179 elections to expense a lot of the equipment purchases in the year that they were purchased. The father's accountant, in an effort to comply with the Guideline regarding depreciation, recalculated the depreciation schedules on five years of tax returns using a straight-line method. The district court utilized the adjusted income following the recalculation of depreciation in arriving at the father's income, and on appeal, we found no abuse of discretion.

In our case, Dan did not adduce evidence in compliance with § 4-204 to show that the assets were ordinary and necessary assets, and that the depreciation was calculated using the straight-line method. In fact, it appears that at least with respect to the 2010 Section 179 expense deduction of $123,369 on Schedule E, this was calculated under the "fast write off" approach. The Cohrs Farms LLC partnership return for 2010 shows that the cost of equipment purchased by the

- 13 -

partnership was $248,368, and the "elected" cost for purposes of depreciation was $246,736; one-half of which ($123,369) was included in Dan's K-1. We conclude that Dan has not met his burden of establishing entitlement to allowance of the Section 179 depreciation expense deductions and the district court erred in allowing these deductions from the Schedule E income.

On the other hand, the district court did not err in its treatment of the depreciation deductions with regard to Dan's other farming income. The Schedule F (Profit or Loss from Farming) of the joint tax returns shows Dan's income from his individual farming operation. For the years 2010, 2011, and 2012 Dan suffered net losses in the sums of $57,852, $74,464, and $83,622, respectively. Although in each of these years Dan deducted "depreciation and section 179 expenses", these deductions were in amounts far less than the net losses and therefore would not have produced positive income had they been added back in for purposes of determining Dan's income.

Thus, in our de novo review, we conclude that the district court erred in its calculation of Dan's income by (1) failing to include $12,838 of partnership income for 2011, and (2) in allowing deductions for Section 179 depreciation expenses for the years 2010, 2011, and 2012. We determine that the correct calculation of Dan's Schedule E income for each of these years is:

2010    Dan's Schedule E income = $149,764
($24,736 total income + $1,659 depreciation + $123,369 Section 179 expense)

2011    Dan's Schedule E income = $ 69,890
($65,475 total income + $1,659 depreciation + $2,756 Section 179 expense)

2012    Dan's Schedule E income = $71,691
($68,582 total income + $1,659 depreciation + $1,450 Section 179 expense)

After adding this farm income to Dan's wages and other income set forth on the tax returns for each of these years, we arrive at the following total income for Dan:

2010    Dan's total income = $191,679
($40,706 wages + $1,209 (dividends, et cetera) + $149,764 Schedule E income)

2011    Dan's total income = $120,637
($46,610 wages + $4,137 (dividends, et cetera) + $69,890 Schedule E income)

2012    Dan's total income = $126,977
($52,608 wages + $2,678 dividends, et cetera) + $71,691 Schedule E income)

Averaging the income for these three years, consistent with the district court's methodology, Dan's average annual income was $146,431, or $12,202 per month.

In conclusion, we reverse the determination of modified child support for Karsten, and we remand the cause to the district court with directions to prepare worksheets using Dan's corrected income and to determine the child support for Karsten accordingly.

Although we have found error in the district court's computation of Dan's income and support obligation and we are remanding the matter to the district court for recalculation of support, we address Lana's additional arguments regarding child support for the sake of completeness.

Lana claims that the court erred in failing to include rental income in calculating support. To the extent that Lana is arguing that the rental income should have been included in Dan's monthly income, as we set forth above, the rental income from Schedule E was in fact included in Dan's income for purposes of setting support for Karsten.

Lana alternatively argues that the rental income should have been included in Chris' monthly income (as opposed to Dan's income) for purposes of determining the support obligation for Drake. Lana suggests that treatment of the rental income in this manner would have lowered the amount of Dan's obligation for Drake, which in turn, would reduce the deduction allowed for support of Drake in determining support for Karsten. However, Lana did not provide the trial court with any suggested child support calculations and likewise she has not provided us with any calculations to show how such treatment of the rental income would have changed the child support calculations for either Drake or Karsten. We cannot say that the district court abused its discretion in including the rental income as Dan's income for purposes of setting the support obligation for Drake.

Next, Lana asserts that the district court incorrectly labeled Dan as "self-employed." Specifically, Lana claims that the incorrect labeling of Dan as "self-employed" on each worksheet caused an excessive tax withholding which artificially reduced his net income. The Nebraska Supreme Court has recognized that "self-employed" persons for purposes of determining child support may include sole proprietors, members of a partnership, and owners of a wholly owned S corporation. *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003). Cohrs Farms LLC is a partnership, and Dan is a partner. Further, Dan is self-employed in his individual farming operation. Therefore, at least in the context of the farming operations, Dan was correctly labeled as "self-employed."

Lana argues that to the extent that Dan is found to be "self-employed," an "interdependent calculation should have been made (e.g. one calculation based on employment income combined with one based on self-employment income from farming)." However, once again, Lana did not present any suggested interdependent calculations to the district court, and has not shown us on appeal how such interdependent calculations would have changed the outcome of the child support determination. In short, we are unable to find an abuse of discretion in the characterization of Dan as self-employed on the child support worksheets.

Lana further claims that the district court incorrectly labeled Dan and Lana as "single" or "head of household," or vice versa, on the various child support worksheets which resulted in Dan receiving improper deductions and net income calculations leading to an improperly calculated support obligation. Lana argues that Dan should have been entered as "single" on all worksheets and Lana should have been entered as "head of household" on all worksheets because "head of household" status is reserved for unmarried individuals. 26 U.S.C. § 2(b).

While the district court did not explain its rationale in preparing the alternate worksheets, presumably it was to take into consideration its decision to alternate the income tax dependency exemption for Karsten. Because Lana did not offer child support calculations to the trial court and has not shown on appeal how the alleged mislabeling of the parties' status on the worksheets would have affected the court's ultimate determination of child support, we are unable to find that this method was an abuse of discretion.

Lastly, Lana asserts that the district court erred in allowing Dan to deduct support for Drake in determining Dan's support obligation for Karsten. Lana argues that Dan did not provide sufficient documentation to allow the court to make an accurate determination of Chris' income.

Neb. Ct. R. § 4-205(E) of the Nebraska Child Support Guidelines provides that "credit may be given for biological or adopted children for whom the obligor provides regular support" and that such a deduction "should be annualized to arrive at monthly net income" for purposes of a child support determination.

The trial court has discretion to choose whether and how to calculate a deduction for subsequent children. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015). See, also, *Brooks v. Brooks*, 261 Neb. 289, 622 N.W.2d 670 (2001). No precise mathematical formula exists for calculating child support when subsequent children are involved, but the court must perform the calculation in a manner that does not benefit one family at the expense of the other. *Id.* See, also, *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). The party requesting a deduction for his or her obligation to support subsequent children bears the burden of providing evidence of the obligation, including the income of the other parent of the child. *Id.* See, also, *Wilkins v. Wilkins*, 269 Neb. 937, 697 N.W.2d 280 (2005); *Crawford v. Crawford*, 263 Neb. 37, 638 N.W.2d 505 (2002); *Brooks v. Brooks*, 261 Neb. 289, 622 N.W.2d 670 (2001). Similarly, deductions for previously born children have been allowed in determining support for a subsequent child. See, e.g., *Barth v. Barth*, 22 Neb. App. 241, 256-57, 851 N.W.2d 104, 117 (2014). See, also *Prochaska v. Prochaska*, 6 Neb. App. 302, 305-308, 573 N.W.2d 777, 779-781 (1998).

In the present case, Dan provided the court with 5 years of the parties' joint tax returns and the W-2 income documentation for Chris. The court utilized Chris' most recent W-2 (2012) to determine her monthly income, which notably is consistent with the court's determination of Lana's income. This was sufficient documentation for the district court to be able to determine Dan's child support deduction for his support of Drake.

The calculation adopted by the district court treats both Drake and Karsten fairly. The court determined that Dan's responsibility for Drake under the guidelines is $874 per month and set Dan's child support obligation for Karsten at $812 per month until Drake attains the Iowa age of majority. The court did not abuse its discretion in calculating the deduction allowed for Dan's previously born child.

### 3. ABATEMENT OF CHILD SUPPORT OBLIGATION

Lana asserts that the district court erred in abating Dan's child support by 80 percent in June and abating one-half of Dan's child support by 80 percent in July each year pursuant to the extended summer parenting time.

The Nebraska Child Support Guidelines provide that during periods of extended parenting time, abatement of a child support obligation may be appropriate. Neb. Ct. R. § 4-210 states in relevant part:

> An adjustment in child support may be made at the discretion of the court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period. During visitation or parenting time periods of 28 days or more in any 90-day period, support payments may be reduced by up to 80 percent. The amount

of any reduction for extended parenting time shall be specified in the court's order and shall be presumed to apply to the months designated in the order. Any documented substantial and reasonable long-distance transportation costs directly associated with visitation or parenting time may be considered by the court and, if appropriate, allowed as a deviation from the guidelines.

Because Dan was awarded one-half of Karsten's summer school vacation, which amounts to more than 28 days in a 90-day period, we find no abuse of discretion in the court's granting of the abatement.

Lana's argument that the abatement should not have been allowed because Dan's transportation expenses would decrease as a result of the modification of parenting time is also without merit. The reference to a "deviation" in child support because of "substantial and reasonable long-distance transportation costs" associated with visitation or parenting time in § 4-210 is a separate consideration than "abatement" due to substantial parenting time. The provision under which the court abated Dan's summer child support recognizes the increased expenses to a noncustodial parent who has a minor child for extended periods of time, and the corresponding reduction in at least some of the custodial parent's expenses during such an extended time. Dan did not seek a deviation from the guidelines due to any substantial travel expenses associated with his parenting time nor did the district court so deviate. This argument is without merit.

The district court did not abuse its discretion in abating Dan's child support in the manner it did.

### 4. RETROACTIVE DATE OF MODIFIED CHILD SUPPORT

Lana asserts that Dan's increased child support obligation should have been made retroactive to the first of the month following the filing of Lana's complaint (November 1, 2010) rather than the date chosen by the court (November 1, 2012). Whether a child support order should be retroactive is entrusted to the discretion of the trial court and will be affirmed absent an abuse of discretion. *Johnson v. Johnson*, 290 Neb. 838, 854, 862 N.W.2d 740, 752 (2015). In determining whether to order a retroactive modification of child support, a court must consider the parties' status, character, situation, and attendant circumstances. *Id*. Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification. *Id*.

In this case, the court did order retroactive support, but not for the entire period back to the filing of the modification complaint. Rather, the court recounted the lengthy delays in the prosecution of this case, some as a result of the parties' numerous motions and some as a result of the court's busy court schedule, as its rationale for choosing the November 1, 2012 retroactivity date (the first day of the month following the commencement of trial).

The question before us is whether the delay in the legal process in this modification proceeding is an equitable consideration meriting a decision to not make the increased support fully retroactive. It has been recognized that children and the custodial parent should not be penalized by the delay inherent in the legal process, nor should the noncustodial parent gratuitously

benefit from such a delay. *Johnson v. Johnson, supra; Pursley v. Pursley*, 261 Neb. 478, 623 N.W.2d 651 (2001); *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013). It appears that the district court was penalizing Lana, in part, for her actions in delaying the legal process. In *Johnson v. Johnson, supra*, the Nebraska Supreme Court found retroactive reduction of the noncustodial father's child support obligation was permissible. The Court acknowledged that the father should not be penalized for the delay in the legal process (which was due in part to the retirement of the judge who presided over the dissolution and in part to the mother's resistance and delay in processing the case). In that case, the cause was remanded to determine whether the father was entitled to a credit against future support payments to offset the retroactive reduction "on a more developed record regarding the parties' relative incomes." 290 Neb. at 857.

In *McDonald v. McDonald, supra*, this court affirmed the trial court's award of retroactive support to the first of the month after the filing of the modification application, recognizing "the principle that a noncustodial parent should not gratuitously benefit from delays in the legal system when he or she should, and is able to, pay an increased amount of child support." *McDonald*, 21 Neb. App. at 548, 840 N.W.2d at 586. We further noted that the obligor parent "did not explain why it would be inequitable for him to pay retroactive support, nor did he explain why paying the lump sum would be a hardship." *McDonald*, 21 Neb. App. at 548-549, 840 N.W.2d at 586.

Dan did not adduce evidence showing that he is unable to pay the increased amount of support, or otherwise show why it would be inequitable or a hardship for him to pay the increased support retroactively to the time of the filing of the modification complaint. The court's order of partial retroactivity is contrary to the general rule and is not based upon equitable considerations relative to Dan's ability to pay. The failure to award fully retroactive support in this case penalizes Lana and Karsten. We conclude that the court abused its discretion in not ordering retroactive support to November 1, 2010.

The court's order of retroactive support to November 1, 2012, and the corresponding lump sum judgment, applied the modified child support of $812 per month, which was based upon Lana's 2012 income and the average of Dan's 2010-2012 income. Because we are reversing and remanding the child support determination, the amount of retroactive support is also likely to change. The amount of retroactive support for the period between November 1, 2010 and November 1, 2012 should be based upon the incomes of the parties during those years, which information is in the record. Thus, we reverse the district court's award of retroactive support and remand the cause with directions to calculate the amount of retroactive support back to November 1, 2010, using the income information in the record for 2010 and 2011, and the recalculated amount of support for the retroactive period of November 1, 2012 through the end of February 2014, based upon the methodology previously used by the district court (using Chris and Lana's 2012 income and Dan's 3-year average).

### 5. REIMBURSEMENT FOR PRIVATE SCHOOL EXPENSES

Lana asserts on appeal that the district court erred by not ordering Dan to reimburse Lana for 50 percent of Karsten's private school tuition and to continue paying 50 percent of her tuition.

Dan testified that Lana was the one who decided to send Karsten to the private school. Dan initially paid 50 percent of the tuition, alleging that he did so based on the mistaken belief that it

was required in the original paternity decree. Once he discovered that this requirement was absent from the decree, he ceased payment beginning with the 2011-2012 school year. Dan testified further that Lana did not ask him to continue paying tuition when he stopped. Lana insists that the decision to send Karsten to private school and split the cost was made by both parties as "joint legal custodians," done with the purpose of Karsten being close to her long-time babysitter who accommodated Lana's early morning work schedule.

Clearly, any agreement to contribute equally to Karsten's private school tuition was not memorialized in writing and was not contained in the original decree. Even if there was an informal agreement in this regard, the district court in its discretion was not bound to require Dan to continuing paying for private school tuition as a part of the modification order. Dan's child support, as modified by the trial court, more than doubled in amount and he was required to pay a judgment of nearly $7,000 for retroactive support (both of which will presumably increase upon remand).

We reject Lana's argument that the district court erred in failing to require Dan to continue to pay the tuition cost based on a legal theory of reliance. We also reject Lana's argument based upon Neb. Rev. Stat. § 42-369(3), which provides, in part, that an order for support may include the providing of education expenses. This statute defers to the discretion of the trial court. *Hoover v. Hoover*, 2 Neb. App. 239, 508 N.W.2d 316, (1993) (reviewing a trial court's order to pay educational expenses for an abuse of discretion).

Upon our review, this court finds no abuse of discretion by the district court in its denial of Lana's request that Dan be required to pay for private school tuition.

### 6. ALLOCATION OF DEPENDENCY EXEMPTION

The original decree awarded the entire tax exemption for Karsten to Lana. Lana argues that the district court erred by modifying the decree and awarding Dan the child dependency tax exemption for Karsten in alternating years.

An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). See, also, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004); *Anderson v. Anderson*, 290 Neb. 530, 536, 861 N.W.2d 113, 119-120 (2015).

Lana specifically asserts that the district court erred in reallocating the tax exemption because (a) no material change in circumstances occurred which would justify the change in allocation, (b) the court lacked authority, and (c) the original paternity decree giving Lana the entire exemption was a settlement agreement which should not be disturbed. However, as articulated below, all three of these arguments are without merit.

### (a) Material Change in Circumstances

A tax dependency exemption is nearly identical in nature to an award of child support or alimony. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). As in the cases of alimony and child support, the allocation of a tax exemption will be modified only upon a showing of a material change in circumstances. *Hall v. Hall*, 238 Neb. 686, 692, 472 N.W.2d 217, 221 (1991). In treating a tax exemption allocation modification as a child support modification, a party can modify a tax exemption allocation by showing that there has been a material change in circumstances since the

court's prior order that was not contemplated when the prior order was entered. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). See, also, *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002).

In the present case, the increase in Dan's child support along with the lump sum award of retroactive support clearly amounts to a material change in circumstances justifying additional modifications to the original child support order, as recognized by the district court in its modification order.

#### (b) Authority of Nebraska Courts to Allocate Federal Tax Exemption for Dependent Child

The general rule is that a custodial parent is presumptively entitled to the federal tax exemption for a dependent child. But, a court may exercise its equitable powers to allocate the exemption to a noncustodial parent. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015); *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005); *McDonald v. McDonald*, 21 Neb. App. 535, 549, 840 N.W.2d 573, 587 (2013).

The primary purpose for permitting a trial court to reallocate the exemption is to allow the party paying support to have more disposable income from which to make such payment. *Anderson v. Anderson*, 290 Neb. 530, 541, 861 N.W.2d 113, 123 (2015). Accordingly, allocation of the dependency exemption to the noncustodial parent is not warranted if the parent pays a relatively small amount of child support. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). Unlike in *Anderson*, where the Nebraska Supreme Court found that the tax exemption was wrongfully awarded to a noncustodial parent who paid only $50 per month in child support, the district court increased Dan's child support obligation to $812 per month which is to increase to $952 per month once Drake attains the age of majority. *Anderson*, 290 Neb. at 541, 861 N.W.2d at 123.

Lana nevertheless argues that Nebraska courts are preempted by federal law and are without authority to allocate the exemption. Lana supports her argument by citing federal regulatory commentary in 73 Fed. Reg. 377797, 37800 (2008), specifically under a section entitled "Explanation of Revisions and Summary of Comments," which provides that state courts are not allowed to allocate an exemption because I.R.C. Section 151 and 152 determine who may claim such a federal income tax exemption and thus preempt state court authority. However, Lana omits that the federal regulations also state that because "section 152(e) provides for the unilateral release of an exemption by a custodial parent . . . final regulations (did) not adopt these comments." 73 Fed. Reg. 377797, 37800 (2008). Therefore, because such commentary did not become part of the federal regulations, there is no basis for Lana's argument that well established Nebraska case law is preempted by federal regulations with regard to this matter.

#### (c) Lack of Binding Power of Original Paternity Decree on District Courts

Lastly, Lana insists once again that because the original settlement agreement entered into by Dan and Lana provided the entire tax exemption to Lana, the district court erred in modifying such a mutually agreed-upon support agreement. As previously established, the relevant inquiry is whether or not a material change in circumstances has occurred justifying a tax exemption

modification from a prior agreement. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). The district court did not abuse its discretion in modifying the original Paternity Decree based on the material change in circumstances impacting Dan's payment of child support.

The district court acted within its discretion and authority in awarding Dan the tax exemption for Karsten in alternating years. Lana's arguments are without merit.

### 7. ORDER FOR COUNSELING

Lana asserts that the district court erred in requiring that Karsten continue counseling with Haley. The court ordered the continued counseling for a limited time not to exceed one year from the date of its order. The modification order was entered July 24, 2014. Following the district court's final order, Lana filed a Motion for Stay Pending Appeal, but the court denied the motion on August 15, 2014. Thus, any issue with respect to the court's order that counseling for Karsten be continued for one year has become moot. See *In re Interest of Shaleia M.*, 283 Neb. 609, 812 N.W.2d 277 (2012) (a case becomes moot when the issues initially presented in the litigation cease to exist, when the litigants lack a legally cognizable interest in the outcome of litigation, or when the litigants seek to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive). We need not address this assigned error further.

### 8. ADMISSIBILITY OF CELL PHONE CONVERSATION RECORDINGS

Both Dan and Lana offered cell phone recordings into evidence and both objected to the other party's admission of such evidence during trial. The court reserved ruling on the objections and in its final order the court sustained both parties' objections.

Lana argues that the district court erred in sustaining Dan's objection to the admission of Lana's cell phone conversation recordings. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015). See, also, *Martensen v. Rejda Bros.*, 283 Neb. 279, 808 N.W.2d 855 (2012). Furthermore, applying a "harmless error" type of analysis, the Nebraska Supreme Court has held that the exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection. *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015). See, also, *Cotton v. State*, 281 Neb. 789, 810 N.W.2d 132 (2011); *Tolliver v. Visiting Nurse Assn.*, 278 Neb. 532, 771 N.W.2d 908 (2009).

We need not decide whether the district court erred in sustaining Dan's objection to Lana's cell phone recordings as we conclude that any such error did not prejudice a substantial right of Lana. Our de novo review of the record reveals that substantially similar evidence to that disclosed on Lana's cell phone recording was admitted at trial without objection by Dan. This evidence generally related to alleged misdeeds by Dan. Further, as we noted in the background section, because Lana was successful in obtaining sole legal custody and retaining physical custody of Karsten, the exclusion of this evidence from the record does not harm Lana. Although Lana raises concerns about Dan's parenting time, we conclude that the admission of the cell phone recordings would not alter our conclusion that the modification of Dan's parenting time was not an abuse of discretion. We find this assignment of error to be without merit.

- 21 -

## 9. ATTORNEY FEES

Lana asserts that the district court erred in not awarding her attorney fees. The district court determined that Lana and Dan should each pay their own attorney fees and costs.

Attorney fees and costs are allowed in paternity and child support cases brought by a child's mother, father, guardian or next friend, the county or other authorized attorney. *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999). See, also, *McDonald v. McDonald*, 21 Neb. App. 535, 550, 840 N.W.2d 573, 587 (2013). An award of attorney fees depends on multiple factors including the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. See *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008). An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Absent such an abuse, the award will be affirmed. *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999). See, also, *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004).

As we noted above, there was considerable delay in this case that was occasioned, in part, by the numerous motions and contempt actions filed by Lana during the pendency of the proceedings. While Lana successfully retained custody of Karsten and obtained an increase in child support, Dan was successful in obtaining increased parenting time, the alternating income tax dependency exemption for Karsten, and in resisting other requests of Lana for various restrictions upon Dan's parenting time.

Upon our review, we find no abuse of discretion in the district court's decision to not award attorney fees to Lana.

## 10. FRAUD BY DAN IN ORIGINAL DECREE

Lana asserts that Dan committed fraud in connection with the original calculation of child support ordered in the March 14, 2005 paternity decree and as a result the child support modification should be applied retroactively to the date of the original decree. Specifically, Lana maintains that Dan failed to disclose his farm income at that time and child support was determined only on his employment income. The district court found that Lana did not satisfy her burden of proof in establishing any fraud was committed by Dan at the time of the Decree regarding the disclosure of his income for purposes of child support determination.

Fraud may consist of words, acts, or the suppression of material facts with the intent to mislead and deceive. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). Based on our de novo review of the record, we agree that the evidence was insufficient to show that Dan suppressed information with an intent to mislead or deceive in connection with the determination of child support during the initial paternity action.

Dan testified that he "presented the farm income and the farm loss along with (it)" to the attorneys involved in the proceedings leading to the original decree with the belief that they would use it in making the child support calculations. Both parties were represented by counsel at the time of the original decree. The actual calculation of child support was not performed by Dan, rather he simply provided the information to facilitate such a calculation by counsel. Further, the income information utilized by the parties and the court in arriving at the stipulated amount of

child support is not contained in this record and, thus, we cannot determine whether any additional income could even have been attributed to Dan at that time.

Lastly, Lana's argument that child support should have been modified retroactive to the date of the original decree based on the alleged fraud is not supported by any authority in her brief and is entirely without merit. The district court acted within its discretion in denying Lana's claim of fraud and request for retroactive application to the date of the original decree.

## 11. REMOVAL FROM STATE

Lana asserts that the district court erred by not allowing her to remove Karsten to Colorado. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). See, also, *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). *After clearing that threshold*, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Id.* (Emphasis supplied). The paramount consideration is whether the proposed move is in the best interests of the child. *Id*.

The district court found that while "there are numerous reasons that qualify as legitimate reasons to grant removal," Lana had no legitimate reason to remove Karsten from Nebraska to Colorado. Specifically, the court held that while Lana at one time had a *potential* job in Denver, at trial she testified that there was no position currently available and no pending offers. (Emphasis supplied.) Additionally, she testified that any job in Denver would simply be a lateral move and that she was uncertain if she even wanted to go to Denver anymore.

Significant career enhancement for a custodial parent is a legitimate reason for removal. *Schrag v. Spear*, 290 Neb. 98, 108, 858 N.W.2d 865, 875 (2015). For example, the Nebraska Supreme Court has held that job-related changes are legitimate reasons for moving where there is a reasonable expectation of improvement in the career or occupation of the custodial parent and the custodial parent's new job included increased potential for salary advancement. *Schrag v. Spear*, *supra*. See, also, *Jack v. Clinton*, 259 Neb. 198, 205-206, 609 N.W.2d 328, 333-334 (2000).

However, even assuming that a potential job could support removal, the potential job at issue here would have only been a lateral move. The lateral move would not entail an increase in income or a promotion and the benefits provided would remain the same as with Lana's current position. In fact, Lana testified that she may choose to work part-time in the transfer position, leading to a decrease in earnings. Lana claims that the transfer position may come with more job security, but this speculation does not support a finding of career enhancement.

Lana also argues that her potential marriage to a man from Colorado, her desire to not work for the same employer as Dan, and her inability to accept a transfer offer from United Airlines until she is granted permission to remove Karsten from Nebraska, provide sufficient support for removal.

A move to reside with a custodial parent's new spouse who is employed and resides in another state may constitute a legitimate reason for removal. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). See, also, *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Maack v. Maack*, 223 Neb. 342, 389 N.W.2d 318 (1986). However, here Lana was not yet married to this

individual and did not testify to any solid plans for marriage. See *Schrag v. Spear*, 290 Neb. 98, 107-109, 858 N.W.2d 865, 875-876 (2015) (custodial parent's desire to move out of state to live with her boyfriend amounted to "a living arrangement which offered no assurance of stability or permanency for herself or her child" and thus weighed against finding a legitimate reason for removal). Therefore, Lana's desire to join a potential spouse is insufficient to qualify as a legitimate reason for removal.

Lastly, Lana's desire to avoid working at the same location as Dan does not provide a legitimate reason for moving to Colorado. Lana did not present any evidence that her present employment was compromised in any way due to Dan working at the same location. Lana did not present evidence of any attempt to find other employment in the Omaha area without the need to move to Colorado.

Child removal determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given deference. *Steffy* v. *Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). We find no abuse of discretion by the district court in finding that Lana failed to show a legitimate reason to remove Karsten from Nebraska to Colorado.

Lana argues that the court should not have rejected her request to remove Karsten from Nebraska without considering all of the removal factors. A trial court is not required to consider the second prong of the removal analysis if the moving party has not shown a legitimate reason for the move. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 250, 597 N.W.2d 592, 598 (1999). In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state, and only after clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Schrag v. Spear*, 290 Neb. 98, 106, 858 N.W.2d 865, 874 (2015).

Because the court found that Lana, as the custodial parent, was unable to provide a legitimate reason for leaving the state, the first hurdle of removal was not overcome and the court correctly ended its removal analysis at that point. See *Schrag v. Spear*, *supra* (ending relocation analysis after finding that custodial parent did not have a legitimate reason for relocating).

## VI. CONCLUSION

We find that the district court erred in its determination of Dan's income, the calculation of modified child support, and its failure to order that the child support be modified retroactively to the first of the month following the modification complaint filing. We reverse those portions of the order and remand the matter to the trial court with directions consistent with this opinion. All other provisions in the modification order are affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.